NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued April 27, 2011
Decided June 30, 2011

**Before**

RICHARD D. CUDAHY, *Circuit Judge*

TERENCE T. EVANS, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 10-3121

| | |
|---|---|
| MARGRIT EAKIN, | Appeal from the United States District |
| *Plaintiff-Appellant,* | Court for the Northern District of Illinois, Eastern Division. |
| *v.* | |
| | No. 09 C 2823 |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | |
| *Defendant-Appellee.* | Young B. Kim, *Magistrate Judge* |

**O R D E R**

Margrit Eakin suffers from arthritis in her left hip and claims that the condition has disabled her since 2004. She applied for disability benefits at age 61, but an administrative law judge concluded that her condition was not disabling and denied her application. Eakin now appeals from the district court's judgment upholding the ALJ's decision. Eakin asserts that the ALJ failed to adequately justify her conclusion and made improper medical and credibility determinations. The ALJ's opinion contains several errors and, on balance, is too cursory to permit meaningful appellate review. Accordingly, we reverse the district court's denial of relief and remand for further proceedings.

## I. Background

The medical chronology in this case is brief, spanning only the two years between the first doctor's visit and the hearing before the ALJ. Eakin, who worked as a waitress from 2000 to 2004 (and before then as a cashier at a currency exchange), was first diagnosed with arthritis in 2005 by Dr. Dennis Mess, an orthopedic specialist. Eakin told Dr. Mess that she fell the previous month and had since experienced pain in her left hip and thigh. An examination revealed an antalgic (abnormally shortened) gait with a limp on the left side and reduced extension in the left hip with pain on hip motion. Dr. Mess, noting that X-rays showed deterioration in the left hip, diagnosed severe degenerative joint disease. He prescribed 75 milligrams of Voltaren, an anti-inflammatory drug. When Eakin returned six weeks later, she told Dr. Mess that the Voltaren had helped, but not as much as the sample of Bextra she had received from her family physician. Eakin also said she was not ready for surgery.

Eight months later, at the behest of the Social Security Administration, Eakin met with Dr. Liana Palacci, an osteopathic physician, for a consultative examination. Dr. Palacci diagnosed osteoarthritis of the left hip and poorly controlled hypertension. Dr. Palacci found that Eakin had an antalgic gate that favored her left leg, reduced left-leg strength, and a reduced range of motion in the left hip and lumbar spine. Eakin told the doctor that she used a cane occasionally for balance. Dr. Palacci observed that she was overweight (226 pounds at five-foot seven) and had trouble getting on the examination table, performing knee squats, and standing on the heel and toes of her left foot. Eakin, however, did not have difficulty with "[s]traight leg raising," was able to cross her legs, and could walk 50 feet without a cane.

Based on Dr. Palacci's findings, a state-agency physician concluded that Eakin had the residual functional capacity ("RFC") for light work. The physician opined that Eakin could lift 20 pounds frequently and 10 occasionally, and that she could sit for six hours in an eight-hour day and stand or walk for six hours in an eight-hour day.

Eakin again saw Dr. Mess in August 2006 and November 2007. The records from those visits—cursory treatment notes mostly—are spare. In the earlier visit, Eakin told Dr. Mess that Voltaren had not improved her hip pain but that she could "live with it." After the next visit, Dr. Mess noted that Eakin's left hip was slowly worsening but she still preferred medication over a hip replacement. At the same time, Dr. Mess completed a "Physical Capacities Assessment" in which he, like Dr. Palacci, diagnosed osteoarthritis of the left hip. Under "significant objective and/or clinical findings," Dr. Mess recorded limited and painful motion of the left hip. He added that Eakin's complaints of severe pain were consistent with his objective findings, that her impairment would last indefinitely,

and that she needed a left hip replacement. With respect to functional limitations, Dr. Mess opined that over an eight-hour day Eakin could sit for one hour, stand or walk for less than one hour, and occasionally lift up to ten pounds. He also opined that she would be unable to use her left leg for repetitive movements and would need "complete freedom" to rest frequently without restriction.

At the hearing before the ALJ, Eakin testified that her arthritis had sharply limited her ability to stand and walk. Citing poor balance and reduced leg strength, she said that she required a cane at all times and could not walk more than ten feet without losing her balance. She said that the pain, which radiated from her hip to her leg and back, was severe and prevented her from performing even the simplest daily activities. Sitting, for instance, caused her legs to swell, and on bad days she could sit for only 15 minutes before having to change positions. But rising, too, was painful, and since she could not readily stand from a sitting position, she had trouble bathing in her tub at home and had to use the walk-in shower in her son's apartment downstairs. Eakin said that she could sleep in only short increments, and that household chores that normally took hours now took days. To minimize the pain, Eakin used heating pads and Bengay and often sat in a recliner to elevate her legs. Although she considered surgery, she said Dr. Mess advised her that there was no guarantee it would help.

A vocational expert testified that Eakin's past work as a cashier is typically performed at the sedentary level. He said that an individual who needs to change positions frequently could still perform the work but would not be able to recline and would need the strength to sit for 20 minutes and stand for five minutes at a time. The work, he acknowledged, would be substantially more difficult if done with a cane; still, of the roughly 19,800 cashier jobs in the region, some 8,000 would permit use of a cane.

Evaluating Eakin's claim under the five-step analysis of 20 C.F.R. § 404.1520(a), the ALJ found that Eakin had not engaged in gainful employment since her onset date (step one); that her arthritis, obesity, and hypertension were severe but did not match or equal an impairment enumerated in the regulations (step two); that Eakin had the RFC to perform the full range of sedentary work (step three); and that Eakin could still perform her past work as a check cashier (step four). Eakin sought review from the Appeals Council, which declined to hear the case. The magistrate judge, presiding with the consent of the parties, upheld the decision of the ALJ.

## II. Discussion

We will uphold the Commissioner's decision if the ALJ applied the proper legal standard and supported her finding with substantial evidence. *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010). Although the ALJ need not address every piece of evidence, if her

discussion of the issues is not developed enough to support meaningful appellate review, it will be remanded. *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010).

Eakin's primary argument on appeal is that the ALJ violated her duty to substantiate the RFC determination. Specifically, she asserts that the ALJ failed to account for Eakin's testimony relating to the severity of her condition and her impaired ability to function in a work setting; failed to analyze the findings of Dr. Mess and Dr. Palacci, in terms of how their findings related to each other or how they could be reconciled with the RFC determination; and, more broadly, failed to point to any evidence that Eakin could perform the full range of sedentary work.

In determining an individual's RFC, an ALJ must evaluate all limitations that arise from a medically determinable impairment and may not ignore a line of evidence contrary to the ruling. *See Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). The RFC determination should include a discussion describing how the evidence, both objective and subjective, supports the ultimate conclusion. *Conrad v. Barnhart*, 434 F.3d 987, 991 (7th Cir. 2006); *Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005); *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001); SSR 96-8p. Social Security Ruling 96-8p instructs ALJ's to assess a claimant's work-related abilities on a function-by-function basis, and although the ALJ need not discuss every piece of evidence, she must still articulate, "at some minimum level," her analysis of the evidence, *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003).

The paucity of analysis in the ALJ's opinion is problematic. After reciting the medical findings, the ALJ concluded the RFC determination with a terse statement that the record "does not provide a basis for finding limitations greater than those determined in this decision." This statement, however, is too perfunctory to permit meaningful appellate review. It fails the evaluation standards of SSR 96-8p and even this court's modest requirement that the ALJ minimally articulate the basis for her conclusion. *Briscoe*, 425 F.3d at 352; *Brindisi*, 315 F.3d at 786. The failure to explain how she found Eakin capable of sedentary work is sufficient cause for reversal, *Briscoe*, 425 F.3d at 352; *Myers*, 238 F.3d at 621, but the error was compounded by the failure to address several lines of evidence contrary to her conclusion. *See Villano*, 556 F.3d at 563. Specifically, the ALJ glossed over Eakin's testimony about limitations arising from radiating pain in her hip, about her inability to sit and stand for extended periods of time, and about the frequency with which she needed to alternate positions. The ALJ altogether ignored Eakin's description of her postural limitations, including her difficulty balancing and rising from a seated position. And the ALJ failed to discuss the significance of Dr. Palacci's findings, which, while hardly decisive, still provided objective evidence (reduced muscle strength in the leg, reduced

range of motion in the hip, antalgic gate, inability to stand on heel or toes) that the arthritis limited Eakin's ability to exert herself.

The Commissioner argues that medical evidence in the reports from Dr. Mess and Dr. Palacci are consistent with a finding that Eakin can perform sedentary work. But the ALJ did not explain what she found instructive in the findings of Dr. Mess and Dr. Palacci, and the agency may not bolster the ALJ's ruling with evidence the ALJ did not rely on. *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010). The *Chenery* doctrine precludes a government lawyer from invoking a new rationale to rehabilitate an administrative decision. *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). Thus, to the extent the Commissioner's new reasons in support of the ALJ's ruling are even relevant, they inform the question of harmless error, which in the administrative setting exists only if we conclude with great confidence that the agency will reinstate its decision, *id*, and we do not reach that conclusion here.

The ALJ's failure to adequately support the RFC determination is reason enough to vacate. *See Briscoe*, 425 F.3d at 352. But the RFC determination was not the only deficient aspect of the opinion, and our conclusion is reinforced by an improper determination about Dr. Mess's medical opinion and a string of errors in the credibility analysis.

Eakin asserts that the ALJ failed to give appropriate weight to the opinion of Dr. Mess, her treating physician, whose conclusions diverge from the RFC determination. The ALJ concluded that neither the state-agency physician nor Dr. Mess reasonably estimated Eakin's physical limitations; according to the ALJ, Dr. Mess appeared to have "relied quite heavily" on Eakin's subjective reports of pain. Eakin contends that Dr. Mess's assessment is supported by the evidence in the record and that the ALJ misapplied the regulations governing medical-source opinions. She further contends that the ALJ lacked a reasonable basis for discounting Dr. Mess's opinion on the grounds that it relied heavily on Eakin's subjective complaints about her functional limitations.

Eakin is correct that the ALJ gave short shrift to Dr. Mess's opinion. A treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). An ALJ who declines to give controlling weight to the opinion of a treating physician must offer "good reasons" that are "sufficiently specific" in explaining what weight, if any, she assigned it. 20 C.F.R. § 404.1527(d)(2); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). Conjecture is not a proper basis for ignoring a medical opinion. *Moss v. Astrue*, 555 F.3d 556, 560 (7th Cir. 2009); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

Although the ALJ fairly observed that the notes from Dr. Mess's examinations were sparse, the doctor's findings did draw upon objective evidence—his examinations of her revealed reduced range of motion in the hip and a limp in the left leg, and an X-ray he consulted confirmed the existence of degenerative joint disease.

But even assuming that the ALJ had legitimate reasons to discount Dr. Mess's opinion, she did not apply the correct legal standard in determining what weight to assign it. *See* 20 C.F.R. § 404.1527(d)(2); *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). Had she considered the required factors, including the nature of the treatment relationship, the frequency of examination, the physician's specialty, the type of tests performed, and the reliability of the opinion, *see* § 404.1527(d)(2), she would have been compelled to give the opinion considerable weight. Not only did Dr. Mess examine Eakin four times in just over two years, but he is the sole orthopedic specialist on record, the only doctor with an expertise in Eakin's condition. He also happens to be the doctor who first diagnosed Eakin's arthritis, and the only doctor on record to have treated the condition and tracked its progress.

Eakin next argues that the ALJ failed to adequately support her adverse credibility finding. She challenges each of the ALJ's stated reasons for discrediting her: Eakin's alleged onset date of August 2004 was inconsistent with her statement to Dr. Mess in May 2005 that she had been in pain since falling on her side the previous month; Eakin's decision not to have surgery and to continue treating the arthritis with medication, as well as her statement that she could "live with" the pain, suggested a condition less severe than she had alleged; her periodic trips to the doctor were inconsistent with the frequency with which one would expect a totally disabled person to receive treatment; and the absence of any prescription for use of a cane suggested that she overstated her need for it.

Although we afford an ALJ's credibility determination considerable deference, *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006), the ALJ must consider the individual's level of pain, treatment, daily activities, and other impairments, and must support the finding with specific reasons consistent with the record. *Larson v. Astrue*, 615 F.3d 744, 752 (7th Cir. 2010).

On the whole the credibility determination does not inspire confidence that the ALJ undertook a careful examination of the record. Three aspects of the determination were particularly troubling. First, the ALJ unreasonably faulted Eakin for not obtaining a prescription for her cane. As this court held in *Terry v. Astrue*, 580 F.3d 471, 477-78 (7th Cir. 2009), the fact that an individual uses a cane not prescribed by a doctor is not probative of her need for the cane in the first place. Second, the ALJ should have developed the record further before discrediting Eakin based on her choice to treat the arthritis with medication

rather than surgery. *See Moss*, 555 F.3d at 561. An ALJ can base an adverse credibility ruling on an applicant's failure to follow prescribed treatment if the treatment is "clearly expected" to restore her capacity to work. S.S.R. 82-59, 1982 WL 31384, at *1; *see also Craft v. Astrue*, 539 F.3d 668, 678-79 (7th Cir. 2008). But there is no medical opinion on record suggesting that a hip replacement would be "clearly expected" to work. Although Dr. Mess noted in his report that Eakin needed a hip replacement, Eakin testified that he had reservations about the procedure and could not guarantee its success. Third, Eakin's decision to "live with" the pain rather than undergo surgery was neither an admission that she could obtain gainful employment nor a proper basis for discrediting her testimony—at least not without analyzing the statement in light of Eakin's daily efforts to cope with her pain. A complete credibility analysis accounts for the applicant's allegations about how her symptoms affect her daily activities. 20 C.F.R. § 404.1529(c); S.S.R. 96-7p, 1996 WL 374186; *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011). Here, had the ALJ given due consideration to Eakin's testimony concerning her daily activities—her difficulty with sitting and standing, her trouble with daily chores, her various coping methods—she would have seen that living with the pain was not a decision reached lightly.

### III. Conclusion

For the foregoing reasons, we **VACATE** the ALJ's ruling and **REMAND** for further proceedings. On remand, the ALJ should substantiate how she arrived at the conclusion that Eakin can perform sedentary work, why she discounted Dr. Mess's opinion, and how much weight, if any, she assigned it under the applicable regulations. The ALJ should also reevaluate Eakin's credibility in accordance with this order.